IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 23-cv-02373-CNS

MARSHALL ADAM WALKER,

Petitioner,

v.

THE ATTORNEY GENERAL OF THE STATE OF COLORADO,
MOSES STANCIL, Executive Director of CDOC, and
BARRY GOODRICH, Warden of CCCF,

Respondents.

_____

**ORDER**

_____

Petitioner Marshall Adam Walker is a convicted and sentenced state prisoner incarcerated at the Crowley County Correctional Facility in Olney Springs, Colorado. Mr. Walker, proceeding *pro se*, brings this habeas corpus action under 28 U.S.C. § 2254 to collaterally challenge his state-court convictions. Mr. Walker was a middle school science teacher accused of unlawful sexual behavior with three children—each a student of his. After waiving his right to a jury trial, the trial court found Mr. Walker "guilty of thirty counts of sexual exploitation of a child, three counts of unlawful sexual contact, and two counts of enticement of a child." ECF No. 17-5 at 2. Mr. Walker's § 2254 application presents three claims based on alleged violations of his constitutional rights. After reviewing the application, answer, reply, and state court record, the Court determines that Mr. Walker

1

shows no basis for federal habeas relief. The Court therefore rejects Mr. Walker's claims and denies the habeas application.

## I. STANDARDS OF REVIEW

"The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires a prisoner who challenges (in a federal habeas court) a matter 'adjudicated on the merits in State court' to show that the relevant state-court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Wilson v. Sellers*, 584 U.S. 122, 124–25 (2018) (citing 28 U.S.C. § 2254(d)(1) and (2)). It is well settled that "when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion[,] a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.* at 125. "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Mr. Walker bears the burden to make these showings under § 2254(d). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

Because Mr. Walker is *pro se*, the Court liberally construes his filings, but will not act as an advocate. *James v. Wadas*, 724 F.3d 1312, 1315 (10th Cir. 2013).

## II. BACKGROUND

The Colorado Court of Appeals (CCA) provided a detailed factual background of

the case against Mr. Walker:

> Defendant began his teaching career in the fall of 1997 as a student teacher
> at Bell Middle School in Jefferson County. After one year, he accepted a
> permanent position as an eighth grade science teacher at Everitt Middle
> School, also in Jefferson County. At both schools, defendant developed
> relationships with his students outside of the classroom. He befriended
> three male students — A.W., T.W., and D.B. — spending time with them
> after school and inviting them on extracurricular outings related to his
> hunting hobby. Ultimately, defendant engaged in inappropriate and unlawful
> behavior with each of these students, giving rise to the criminal charges in
> this case.
>
> Evidence at trial showed that A.W. had just turned fourteen years old when
> he was a student in defendant's class at Bell Middle School. In
> conversations during class and afterschool help sessions, A.W. learned of
> defendant's passion for hunting. A.W. became intrigued by the idea of duck
> hunting, and with defendant's help, A.W. obtained his mother's permission
> to go duck hunting with defendant. A.W. and defendant went on two or three
> day trips together during the fall 1997 duck season.
>
> A.W. continued to hunt with defendant the following fall when he was fifteen
> years old. At defendant's suggestion, A.W. began to spend the night before
> their hunting trips at defendant's parents' home (where defendant was living
> at the time) in order to get an early morning start. One night, defendant
> offered A.W. a handgun if A.W. would allow defendant to photograph him
> nude. This offer caught A.W. by surprise, and when A.W. asked defendant
> why he wanted the nude photographs, defendant responded that it was for
> "blackmail reasons. . . to get back at [A.W.] sometime in the future if [he]
> ever did something." A.W. undressed for defendant, and defendant took at
> least six photographs in which A.W. was nude and touching himself.
> However, defendant did not give A.W. the handgun after he posed for the
> photographs. Rather, defendant told A.W. that he would have to work to get
> the gun. A.W. declined to pose nude for defendant on a second occasion
> because he "didn't want the gun bad enough."
>
> T.W. was in defendant's class at Everitt Middle School during the 2002-
> 2003 school year. T.W. often spent time with defendant after school, and

they talked about hunting and other extracurricular interests. About two weeks into the school year, defendant offered to take T.W. to a shooting range. Soon after, defendant paid for T.W. to get his hunter's safety license so that they could hunt together. Defendant and T.W. went on at least twenty hunting trips that year, including overnight trips, where defendant provided the equipment and paid the entire cost of the trips. They continued to hunt together the following year after T.W. entered high school, although the trips became less frequent.

On one of their earliest overnight trips, defendant asked T.W. to perform a dare for him. Specifically, he asked T.W. to do ten naked jumping jacks in front of him, explaining that the dare would be T.W.'s "way of paying" for the hunting trips. T.W. initially refused, but after about an hour of arguing with defendant, T.W. eventually relented and performed the jumping jacks.

According to T.W.'s testimony at trial, the dares became routine after this first incident. Defendant would suggest some kind of dare on nearly every subsequent hunting trip, and would also suggest a dare on other occasions, such as when he invited T.W. to the movies, to Dairy Queen, or to his house to watch wrestling. While the dares constantly changed to correspond to the amount of money spent by defendant, they always involved T.W. removing his clothes for defendant. At trial, T.W. explained that he was asked to pose in various nude positions, to watch pornographic movies, to pose for nude photographs, and to create nude videos. Indeed, police found twenty photographs and two videos of T.W. The videos and photos were admitted into evidence at trial, and the court made the following findings of fact:

> There are two videos . . . which contain [T.W.] naked for relatively lengthy periods of time being directed by the defendant of what to do, where to stand, how [to] walk, how to lean over, how to lie down, how to masturbate, whether or not to ejaculate . . .

> In addition, there are photographs . . . that show [T.W.] naked in . . . to some extent, erotic poses. In any event, sexually explicit naked photographs of [T.W.]

> In addition, during these photo sessions and video sessions, the defendant would put pornography [on] or have [T.W.] put pornography on the DVD so that that would assist [T.W.] in getting aroused so the defendant could take the videos of [T.W.] while he was aroused and masturbating.

4

T.W. testified at trial that the dares became such a regular occurrence that defendant would no longer have to ask T.W. to perform them.

D.B., the final student victim in this case, was in defendant's class at Everitt the same year as T.W. Like A.W. and T.W., D.B. would spend time with defendant after school, such as when defendant was grading papers, and they would discuss their interests and hobbies with each other. At one point, D.B. asked defendant if he could go hunting with defendant. Defendant explained that D.B. would first have to obtain a hunter's safety license. Because D.B. was not interested in undertaking the license certification process, defendant suggested skeet shooting as an alternative activity.

Thereafter, D.B. and defendant made arrangements to go skeet shooting together. They left directly from school one Friday afternoon, first stopping at defendant's parents' house so that defendant could retrieve his guns. They were inside defendant's bedroom when D.B. spotted a pornographic DVD and a deck of playing cards decorated with images of naked women. D.B. casually joked about the DVD and cards, but defendant became noticeably worried and responded that he could not trust D.B. to keep a secret, that he was concerned that D.B. had "dirt on him," and that he could "lose his job." After this brief exchange, D.B. and defendant went to the shooting range as planned.

On the drive home, defendant repeated his concern that D.B. had "dirt on him" and suggested that D.B. pose for nude photographs in return. D.B. refused, but defendant persisted with his request and brought D.B. back to his bedroom. There, defendant first tried to change D.B.'s mind by offering him the deck of playing cards, which D.B. declined. Defendant next offered D.B. a duck call device for use in duck hunting, and D.B. again declined. Finally, defendant offered to change D.B.'s recent test grade from "F" to "B" if he would pose for nude photographs. D.B. agreed at this point because, as he explained at trial, he "needed that grade on that test." Accordingly, D.B. undressed and reclined on the bed for several photographs. Defendant then played a pornographic DVD and asked D.B. to get an erection for more photographs. He repeated this request more than ten times, even offering to give the DVD to D.B. However, D.B. refused, and defendant ceased taking the photographs.

The above incidents between defendant and A.W., T.W., and D.B., respectively, were kept a secret until late April 2006. At that time, D.B. was watching a movie that sparked a repressed memory of defendant taking

nude photographs of him. D.B. confided in his father about the photo session and met with a therapist. With D.B.'s consent, the therapist disclosed the incident to authorities.

On May 10, 2006, the prosecution charged defendant with one count of sexual exploitation of a child and one count of enticement of a child in connection with D.B.'s allegations. Numerous counts were then added to the complaint and information as law enforcement officials recovered additional evidence of the various incidents described above as to the three victims. Several counts were also amended or dismissed over time to correspond to the unfolding investigation. Defendant was ultimately charged with thirty counts of sexual exploitation of a child, four counts of unlawful sexual contact, and three counts of enticement of a child.

At a motions hearing one week prior to trial, defendant waived his right to a jury trial, and on February 12, 2007, a two-day trial to the court commenced. At trial, the prosecution presented, among other evidence, the live testimony of A.W., T.W., and D.B., and the various nude photographs and videos that had been recovered of these boys. After a proper advisement, defendant waived his right to testify at trial.

Based on the evidence adduced at trial, the court convicted defendant of thirty counts of sexual exploitation, three counts of unlawful sexual contact, and two counts of enticement. The court then sentenced defendant as follows: (1) four years in prison for each of the six exploitation counts involving A.W.; (2) an indeterminate sentence of twelve years to life in prison for each of the twenty-three exploitation counts involving T.W.; (3) an indeterminate sentence of eight years to life in prison for the one exploitation count involving D.B.; (4) six years in prison for each of the two unlawful sexual contact counts involving T.W.; (5) four years in prison for one unlawful sexual contact count involving D.B.; (6) an indeterminate sentence of six years to life in prison for the one enticement count involving T.W.; and (7) an indeterminate sentence of four years to life in prison for the one enticement count involving D.B. The court ran all sentences for each victim concurrently with one another, and also ordered the separate sentences as to A.W., T.W., and D.B. to run consecutively.

ECF No. 17-5 at 2–10.

As relevant here, Mr. Walker argued on direct appeal that "the indeterminate sentences imposed on the twenty-four sexual exploitation counts" were invalid. *Id.* at 49.

"First, he contend[ed] the trial court erred by imposing indeterminate sentences because they were not actually charged in the information as sentence enhancers. Therefore, he [claimed] the sentences must be vacated and replaced by determinate sentences." *Id.* "Alternately, he contend[ed] the sentences must be vacated because he did not voluntarily, knowingly, and intelligently waive his right to have a jury find the facts required for discretionary indeterminate sentencing." *Id.* at 49–50.

After granting certiorari, the Colorado Supreme Court (CSC) rejected Mr. Walker's first contention, concluding "that the information was sufficient, as it identified the essential elements of the crime charged." *People v. Walker*, 318 P.3d 479, 486 (Colo. 2014). However, as to the alternative argument, the CSC held "that a defendant may not litigate the validity of . . . a [jury trial] waiver on direct appeal but must do so in a post-conviction proceeding." *Walker*, 318 P.3d at 481.

Following the conclusion of his direct appeal, Mr. Walker sought post-conviction relief under Colo. R. Crim. P. 35(c). Mr. Walker claimed "that (1) he did not make a constitutionally valid waiver of his right to a jury trial and (2) he had ineffective assistance of counsel for his defense at trial." ECF No. 17-14. Ultimately, the trial court denied Mr. Walker's claims and the CCA affirmed. The state court's analysis of each claim will be set forth in more detail below.

After the state proceedings came to an end, Mr. Walker filed this federal habeas corpus action under 28 U.S.C. § 2254. ECF No. 1. The operative habeas application presents three claims, which will be expanded upon below. ECF No. 8. As relief, Mr.

Walker is seeking reversal of his sentences and a new trial, or alternatively, resentencing to determinate sentences on the exploitation counts. *Id.* at 17–18.

In their answer, Respondents contend the CCA's resolution of each claim was not contrary to, or an unreasonable application of, clearly established federal law—barring habeas relief under § 2254(d)(1). ECF No. 29. Nor were the CCA's factual findings unreasonable, making relief unavailable under § 2254(d)(2). *Id.* Mr. Walker maintains that the state criminal proceedings violated his constitutional rights, requiring habeas relief. ECF No. 30. The Court will now discuss each claim.

## III. DISCUSSION

### A. Claim 1: Jury Trial Waiver

Mr. Walker first argues that his waiver of a jury trial was not made knowingly and intelligently because: (1) the complaint and information did not notify him of the discretionary sentence enhancer, C.R.S. § 18-1.3-1004(4)(1)(II), that allowed for indeterminate life sentences on the exploitation charges if it was proven beyond a reasonable doubt that he (a) committed an economic sex crime, and (b) he was likely to commit one or more of the offenses specified in the statute; and (2) he was unaware that, by waiving his right to a jury trial, he would also be waiving his right to having a jury, as opposed to a judge, make the sentence-enhancing findings just discussed. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *Blakely v. Washington*,

8

542 U.S. 296 (2004). ECF No. 8 at 7–9. He claims violations of his Fifth, Sixth, and Fourteenth Amendment rights. *Id.*

Respondents counter that AEDPA bars relief because the CCA's rejection of this claim was not contrary to, or an unreasonable application of, binding Supreme Court precedent. ECF No. 29 at 21–37. The Court will recount why the CCA rejected the claim, and then address whether the requirements of § 2254 have been met.

*1. CCA's denial of the claim*

The CCA concluded that Mr. Walker's jury trial waiver was voluntary, knowing, and intelligent. The Court includes the relevant excerpt of that decision:

A. Jury Trial Waiver

1. Standard of Review and Applicable Law

A criminal defendant charged with a felony has a constitutional right to a jury trial. U.S. Const. amend. VI; Colo. Const. art. II, ¶ 23. However, this right may be waived. *See, e.g.*, *Stackhouse v. People*, 2015 CO 48, ¶ 8. Whether a defendant has effectively waived a constitutional right presents a mixed question of law and fact. *See People v. Bergerud*, 223 P.3d 686, 693 (Colo. 2010). Where a trial court resolves a challenge to the validity of such a waiver, the trial court's factual findings are reviewed for clear error, while its ultimate legal conclusion regarding the validity of the waiver is reviewed de novo. *See People v. Blehm*, 983 P.2d 779, 792 n.9 (Colo. 1999).

A waiver of a defendant's right to a jury trial must be voluntary, knowing, and intelligent. *See Walker II*, ¶ 14. A waiver is voluntary if it is "not coerced . . . either physically or psychologically." *Id.* at ¶ 16 (citation omitted). A waiver is knowing "if the defendant knows of 'the existence of the right and any other information legally relevant to the making of an informed decision either to exercise or relinquish that right.'" *Id.* (citation omitted). And the waiver is "intelligent if the defendant is 'fully aware of what he is doing and . . . make[s] a conscious, informed choice to relinquish the known right.'" *Id.* (citation omitted).

To assist courts with determining whether a defendant who wishes to waive his right to a jury trial is acting of his own volition and fully understands the consequences of doing so, the Colorado Rules of Criminal Procedure outline several factors that the trial court should consider before "proceed[ing] with a trial to the court after waiver of jury trial." Crim. P. 23(a)(5)(II). Two subsections of Crim. P. 23 address the voluntariness requirement. *See* Crim. P. 23(a)(5)(II)(a) (providing that the court shall not proceed with a trial to the court without first determining that the defendant's waiver is voluntary); Crim. P. 23(a)(5)(II)(b)(v) (providing that the court should ensure that a defendant's waiver is his choice "alone and may be made contrary to counsel's advice"). The remaining factors in Crim. P. 23(a)(5)(II)(b) are intended to "assist" the court in determining whether "the waiver is knowing and intelligent." *Walker II*, ¶ 18. They require the court to ensure that the defendant understands that

> 1. "[t]he waiver would apply to all issues that might otherwise need to be determined by a jury including those issues requiring factual findings at sentencing";
> 2. "[t]he jury would be composed of a certain number of people";
> 3. "[a] jury verdict must be unanimous"; and
> 4. "the judge alone" decides the verdict in a trial to the court.

Crim. P. 23(a)(5)(II)(b)(i)-(iv).

Although it is "best practice for a trial court to establish all of the provisions found in Crim. P. 23(a)(5)(II) on the record," a "court's failure to explicitly address each provision on the record does not per se violate a defendant's fundamental jury trial right." *Walker II*, ¶ 19; *see also People v. Thompson*, 121 P.3d 273, 276 (Colo. App. 2005) (rejecting contention that a valid waiver of the right to jury trial "presupposes extensive, on-the-record advisements"). Rather, the "constitutional imperative," *Walker II*, ¶ 19 (citation omitted), is simply that a defendant's waiver of his right to a jury trial is voluntary, knowing, and intelligent. Therefore, "the validity of a defendant's waiver does not hinge upon any formula, nor is strict compliance with Rule 23(a)(5)(II) a sine qua non for a valid waiver." *Id.*

2.  Analysis

The postconviction order recounted the on-the-record advisement the trial court had with Walker:

> [Counsel]: Your Honor, the defendant desires to waive his right to a jury in this case, and we would ask that the matter be heard by this Court.
> [Court]: And what's the position of the People?
> [Prosecutor]: We have no objection to the Court hearing this matter.
> [Court]: And, Mr. Walker, you understand you have the right to a jury trial?
> [Defendant]: That's correct.
> [Q]: And here your attorney is representing that you wish to waive a jury trial; is that correct?
> [A]: That is correct.
> [Q]: Are you under the influence of any drugs, alcohol, or medications?
> [A]: No, I'm not.
> [Q]: Have you been forced or coerced to waive a jury trial in this case in any way?
> [A]: No, I have not.
> [Court]: The Court finds the defendant has entered a knowing and intelligent waiver of his right to jury trial, and the matter will be heard by the Court.

It is undisputed that this colloquy did not explicitly address all of the factors enumerated in Crim. P. 23(a)(5)(II). But, as we have already noted, a valid waiver does not necessarily hinge on strict compliance with Rule 23(a)(5)(II). *Walker II*, ¶ 19. We therefore consider whether the record supports the postconviction court's conclusion that, notwithstanding the court's deviation from the Rule, Walker nonetheless voluntarily, knowingly, and intelligently waived his right to a jury trial.

The colloquy quoted above confirmed that Walker understood he had a right to have his case decided by a jury and decided on his own volition to waive his right to a jury trial. What was missing — at least under the factors outlined in Crim. P. 23(a)(5)(II)(b) — was an explanation of how many people would sit on a jury, the requirement of jury unanimity, and the fact that, in the event of a waiver, the judge would act as the sole fact finder. Viewing the record as a whole, we conclude that, despite these omissions, there was record support for the trial court's finding that Walker understood what he was giving up by waiving his right to a jury trial. *See Walker II*, ¶ 16.

We acknowledge there was no direct evidence that Walker was informed that the jury would be composed of twelve persons or that a jury verdict

must be unanimous. But it was nonetheless clear that Walker made a knowing and intelligent decision. Indeed, trial counsel informed Walker that it would be best to have the court, rather than a jury, act as the fact finder due to the likelihood that the jury would view him unfavorably upon learning of the nature of the charges and the prosecution's evidence. Walker was aware of the jury's role as sole fact finder and strategically decided against presenting his case to a jury. Put another way, his decision to waive his right to a jury trial did not hinge on the jury's size or the requirement of unanimity; instead, he believed that having a jury act as the fact finder would be riskier than having a judge fulfill that role. As trial counsel testified, "[I]t would be very difficult for a jury to give [Walker] a fair shot" because the jurors "would be overcome by the emotion associated with those videos." And because Walker made a strategic decision to avoid jury factfinding due to the likelihood of an unfavorable outcome, it followed that he also relinquished any right that he had to sentence-related factfinding by a jury, *see generally Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004), as well as any opportunity that he might have to raise a challenge to section 18-1.3-1004(4)(a), C.R.S. 2007, [footnote omitted] the statute that he argues unconstitutionally prevented the jury from deciding whether to impose lifetime sentencing on the exploitation charges.

As the postconviction court put it, because Walker's goal was to avoid having his fate decided by a jury that would be inflamed by the nature of the evidence against him, "[a]n advisement of the number of jurors, unanimity requirement, or technical legal issues would not have made any difference here." Therefore, even absent an advisement that strictly communicated all of the Crim. P. 23(a)(5)(II) factors, the postconviction court's legal conclusion that Walker's waiver was voluntary, knowing, and intelligent is supported by the record, and we will not disturb it. *See People v. Curtis*, 681 P.2d 504 n.16 (Colo. 1984); *cf. Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (holding that a waiver is valid if it is a knowing and intelligent relinquishment of a known right under the totality of the circumstances based "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused").[2]

[Footnote 2 In reaching this conclusion, we observe that in *People v. Walker* (*Walker II*), our supreme court cautioned against "undue fidelity to Rule 23," observing that strict adherence to the rule "would improperly allow a criminal defendant to make a strategic decision waiving his right to a jury trial, only to challenge that decision on technical grounds after his conviction." 2014 CO 6, ¶ 19 n.3. That appears to have been precisely what happened here. At the postconviction hearing, defense counsel testified that he recognized

12

the deficiency in the Crim. P. 23(a)(5)(II) advisement at the time that it happened. But rather than raising the issue with the court at the time, he told Walker that "that's a gift to you, and that may be your best basis for appeal, depending on how this trial goes."]

ECF No. 17-14 at 4–11.

### 2.  Application of § 2254

Respondents answer that AEDPA bars relief because the CCA's rejection of this claim was not contrary to, or an unreasonable application of, binding Supreme Court precedent. The Court agrees.

A criminal defendant may waive many constitutional rights, including the right to a jury trial. *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995) ("A criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution."). A valid waiver may take the form of an express statement relinquishing the right or it can be implied from the facts of the case. *See North Carolina v. Butler*, 441 U.S. 369 (1979). To be effective, a waiver must be knowing, voluntary, and intelligent. *See Iowa v. Tovar*, 541 U.S. 77, 88 (2004).

Whether a waiver is knowing, voluntary, and intelligent "depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (internal quotation marks omitted). Mr. Walker bears the burden of proving that he did not competently and intelligently waive his right to a jury trial. *See Tovar*, 541 U.S. at 92.

The CCA reasonably concluded that Mr. Walker made a knowing, voluntary, and intelligent waiver of his right to a jury trial. The CCA applied the governing legal standard articulated above, and did so in a reasonable manner. As explained by the CCA, "trial counsel informed Walker that it would be best to have the court, rather than a jury, act as the fact finder due to the likelihood that the jury would view him unfavorably upon learning of the nature of the charges and the prosecution's evidence. Walker was aware of the jury's role as sole fact finder and strategically decided against presenting his case to a jury." ECF No. 17-14 at 9–10. As the state court reasoned, "his decision to waive his right to a jury trial did not hinge on the jury's size or the requirement of unanimity; instead, he believed that having a jury act as the fact finder would be riskier than having a judge fulfill that role." *Id.* at 9–10. These findings are supported by the state court record. ECF No. 28, Hr'g Tr. Oct. 16, 2019 at 39-41, 162–66. And the CCA's findings of fact must be presumed correct in the absence of clear and convincing evidence to the contrary under § 2254(e)(1). Mr. Walker does not present clear and convincing evidence to rebut the presumption of correctness.

Mr. Walker resists this conclusion. He does so by pointing to two legal aspects of his case which he says were not explained to him. Both center around Colorado's discretionary sentence enhancement statute, Colo. Rev. Stat. § 18-1.3-1004(4)(1)(II). *See* ECF No. 8 at 7–9; ECF No. 30 at 3. He first argues that he was not informed that the exploitation counts potentially exposed him to a life sentence. *Id.* This is so, says Mr. Walker, because notice of the potential for an enhanced sentence was not specifically

included in the charging documents. *Id.* Relatedly, he maintains that he did not know that by waiving his right to a jury trial that he was also waiving his right to have a jury, as opposed to a judge, decide whether the sentencing enhancement applied. *Id.* The arguments fail for at least two reasons.

First, the CCA did not unreasonably apply clearly established federal law as determined by the Supreme Court. Mr. Walker contends that his jury trial waiver was invalid because the charging document didn't give sufficient notice of a potential sentencing enhancement, nor did he know that *Apprendi* and *Blakely* required such an enhancement to be proven to a jury. But Mr. Walker does not show how the CCA arrived at a conclusion opposite to the Supreme Court on a question of law. Mr. Walker does not cite, and the Court has not found, a materially indistinguishable Supreme Court decision that compels such a result. *See Williams*, 529 U.S. at 405. Since Mr. Walker does not cite a Supreme Court decision where a jury trial waiver was invalidated under materially indistinguishable facts, the claim fails. *House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008) ("The absence of clearly established federal law is dispositive under § 2254(d)(1).").

Second, the claim still falters when compared to relevant Supreme Court precedent delineating what it means for a waiver to be voluntary, knowing, and intelligent. Mr. Walker relies on a specific legal consequence of waiving his right to a jury trial—that a trial judge would determine whether the showings needed to enhance his sentence had been proven. But, in *United States v. Ruiz*, 536 U.S. 622 (2002), the Supreme Court explained that "the law ordinarily considers a waiver knowing, intelligent, and sufficiently

15

aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it." *Id.* at 629 (emphasis in original). As the CCA found, "because Walker made a strategic decision to avoid jury factfinding due to the likelihood of an unfavorable outcome, it followed that he also relinquished any right that he had to sentence-related factfinding by a jury[.]" ECF No. 17-14 at 10. In other words, knowing that a judge will determine facts related to both guilt *and* any sentencing enhancements is not "critical information of which the defendant must always be aware prior to" validly waiving his right to a jury trial. *Ruiz*, 536 U.S. at 630. The critical fact here was that Mr. Walker knew the trial judge would act as the factfinder in his case (and strategically wanted it that way) based on his own desire to avoid perceived prejudice from a jury.[1] *See also Patterson v. Illinois*, 487 U.S. 285, 294 (1988) ("If petitioner nonetheless lacked a full and complete appreciation of all of the consequences flowing from his waiver, it does not defeat the State's showing that the information it provided to

---

[1] This conclusion is further supported by what Mr. Walker does, and does not, argue. Mr. Walker *does* argue that his jury trial waiver was invalid because he did not know, at the time of his waiver, all of the legal consequences that may flow from his decision. But Mr. Walker *does not* argue, either in this Court or anywhere in the state court record, that he would have made a different choice in this case—*i.e.*, had he known that the sentence enhancement facts would be decided by a judge, that he would have opted to try his case before a jury. And nowhere does Mr. Walker suggest that the outcome would have been different. The arguments Mr. Walker makes amount to claimed technical deficiencies. Both the United States Supreme Court and the Colorado Supreme Court have expressed concern for criminal defendants challenging their own decisions to waive a jury trial after the fact on such grounds. *See Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 281 (1942) ("Simply because a result that was insistently invited, namely, a verdict by a court without a jury, disappointed the hopes of the accused, ought not to be sufficient for rejecting it."); *see also Walker*, 318 P.3d at 485 n.3 (recognizing that "undue fidelity to Rule 23 would improperly allow a criminal defendant to make a strategic decision waiving his right to a jury trial, only to challenge that decision on technical grounds after his conviction").

him satisfied the constitutional minimum.") (quotations and citation omitted). Nothing about the CCA's resolution of the claim was contrary to, or an unreasonable application of, Supreme Court precedent. As such, habeas relief is not available.

**B.  Claim 2: Ineffective Assistance of Counsel**

In his second claim, Mr. Walker alleges that defense counsel was ineffective for conceding guilt on 30 sexual exploitation counts in closing arguments without consulting him, after he had pleaded not guilty. *Id.* at 9–12. He argues that this violated his constitutional rights and autonomy to decide fundamental aspects of his defense. *Id.* The Court will set forth the CCA's resolution of the claim, and then discuss whether the requirements of § 2254 have been met.

*1.  CCA's Resolution*

The CCA denied this claim, finding Mr. Walker failed to make the showings required by *Strickland v. Washington*, 466 U.S. 668 (1984):

4. Conceding Guilt on Exploitation Counts

Walker argues that when pleading not guilty he asserted his innocence, and that trial counsel usurped his right to assert an innocence defense by conceding that he was guilty of exploitation during closing arguments. Relying on *McCoy v. Louisiana*, Walker contends that counsel's concession on the exploitation counts deprived him of his Sixth Amendment right to the effective assistance of counsel. 584 U.S. ___, ___,138 S. Ct. 1500, 1505 (2018) (holding that "a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experience-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty").

At the threshold, we reject Walker's suggestion that his decision to plead not guilty bound his attorney to asserting an innocence defense on all charges. Rather, all that it did was shift the burden to the prosecution to

17

prove his guilt beyond a reasonable doubt. *See Wood v. United States*, 128 F.2d 265, 273 (D.C. Cir. 1942) ("The function of [a not guilty] plea is to put the Government to its proof and to preserve the right to defend. It does not go to prove that the defendant is innocent."); *see also People v. Garcia*, 573 N.Y.S.2d 257, 259 (App. Div. 1991) ("There is certainly no question that a plea of not guilty, entered at arraignment, is not the equivalent of a factual assertion of innocence."). And while defense counsel could not override that decision by pleading guilty on Walker's behalf, *see Florida v. Nixon*, 543 U.S. 175, 187–88 (2004), it does not follow that a defendant's decision to plead not guilty, standing on its own, restricts the legal strategy that defense counsel may pursue throughout the remaining proceedings.

In any event, *McCoy* was decided over ten years after Walker's trial and four years after his direct appeal mandated. Therefore, trial counsel's concession could not have been improper in light of *McCoy* at the time of trial. *See Ardolino v. People*, 69 P.3d 73, 76 (Colo. 2003) (noting that when reviewing counsel's performance, courts "evaluate particular acts and omissions from counsel's perspective *at the time*") (emphasis added).

Even if *McCoy*'s reasoning were to apply retroactively to Walker's situation, however, his argument would still fail as a factual matter. In *McCoy*, trial counsel, despite the defendant's explicit instructions not to concede guilt, told the jury that the evidence would reasonably show that the defendant committed the murders. *McCoy*, 584 U.S. at___, 138 S. Ct. at 1506. The Court concluded that "it is the defendant's prerogative, not counsel's, to decide on the objective of his defense" and therefore held that "[w]hen a client expressly asserts that the objective of '*his* defense' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." *Id.* at 1505, 1509. Here, in contrast, while trial counsel strategically conceded Walker's guilt on some counts, *he did not contravene Walker's wishes in doing so*. Rather, as the postconviction court found, and as we have already discussed, trial counsel conceded guilt on counts carrying discretionary indeterminate sentences as part of an agreed-upon strategy that was intended to gain credibility with the fact finder and avoid convictions on those counts that carried mandatory indeterminate sentences. As support for this conclusion, the court observed that Walker never claimed in his postconviction testimony that counsel made explicit statements that he disagreed with or that he had ever voiced concerns over this strategy. The record supports these findings. Accordingly, we conclude that, because his concessions of guilt were strategic and did not contravene Walker's explicitly stated desire to maintain his innocence on all charges, trial counsel's performance was

18

not deficient in this regard.

ECF No. 17-14 at 20–23.

>    *2.  Application of § 2254*

Respondents maintain that the CCA reasonably concluded that *McCoy* did not apply retroactively, and that counsel's performance was not deficient under *Strickland*, so habeas relief is unavailable under § 2254(d)(1). ECF No. 29 at 40–51. The Court agrees.

First, the court correctly concluded that *McCoy v. Louisiana*, 584 U.S. 414, 423 (2018)—a case decided over ten years after Mr. Walker's trial and four years after the conclusion of his direct appeal—did not apply retroactively on collateral review. "Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague v. Lane*, 489 U.S. 288, 310 (1989). Mr. Walker does not contend that any exception to this general rule applies. Thus, the CCA reasonably concluded that *McCoy* was inapplicable to his case on collateral review.

Second, the Court finds that the CCA applied the correct legal standard to Mr. Walker's ineffective assistance of counsel claim, and did so in a reasoned manner. A defendant in a criminal case has a Sixth Amendment right to the effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). To establish that counsel was ineffective, Mr. Walker must demonstrate both deficient performance and that counsel's deficient performance resulted in prejudice. *Id*. at 687. If Mr. Walker fails to satisfy either prong of the *Strickland* test, the ineffective assistance of counsel claim must

be dismissed. *Id.* at 697. In general, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. There is "a strong presumption" that counsel's performance falls within the range of "reasonable professional assistance." *Id.* It is Mr. Walker's burden to overcome this presumption by showing that the alleged errors were not sound strategy under the circumstances. *See id.*

The challenge of demonstrating that counsel was ineffective is even greater for a state prisoner seeking federal habeas corpus review under § 2254(d). *See Harmon v. Sharp*, 936 F.3d 1044, 1058 (10th Cir. 2019). "When assessing a state prisoner's ineffective-assistance-of-counsel claims on habeas review, [federal courts] defer to the state court's determination that counsel's performance was not deficient and, further, to the attorney's decision in how to best represent a client." *Id.* (internal quotation marks and brackets omitted). Thus, review under § 2254(d) is doubly deferential. *See id.* "The question is whether *any* reasonable argument exists that counsel satisfied *Strickland's* deferential standard." *Id.* (citations and internal quotes omitted). "And because the *Strickland* standard is a general standard, a state court has . . . more latitude to reasonably determine that a defendant has *not* satisfied that standard." *Id.* Put simply, deference to the state court is "near its apex" when a state prisoner's habeas petition involves a *Strickland* claim. *Sexton v. Beaudreaux*, 585 U.S. 961, 968 (2018) (per curiam).

Under the prejudice prong, Mr. Walker must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient

to undermine confidence in the outcome." *Id.*; *see also Richter*, 562 U.S. at 112 (stating that the "likelihood of a different result must be substantial, not just conceivable"). In determining whether Mr. Walker has established prejudice, the Court must look at the totality of the evidence and not just the evidence that is helpful to him. *See Boyd v. Ward*, 179 F.3d 904, 914 (10th Cir. 1999).

Here, the CCA found that, even assuming that *McCoy* did apply, counsel's conduct in this case did not contradict it. *McCoy* involved a criminal defendant who insisted that the *objective* of his defense was to maintain innocence of the charged criminal acts and pursue an acquittal. *McCoy*, 584 U.S. at 417–18. The defendant maintained that his Sixth Amendment rights were violated by trial counsel's decision to concede guilt in the hopes of avoiding the death penalty. *Id.* The Supreme Court agreed, holding that the Sixth Amendment guarantees a defendant the right to choose the objective of his defense and to insist that his counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty. *Id.* at 423.

The CCA distinguished *McCoy*. As it explained, Mr. Walker never insisted that his attorney maintain an innocence defense. In contrast to *McCoy*, "while trial counsel strategically conceded Walker's guilt on some counts, *he did not contravene Walker's wishes in doing so.*" ECF No. 17-14 at 23. "Rather, as the postconviction court found,[] trial counsel conceded guilt on counts carrying discretionary indeterminate sentences as part of an agreed-upon strategy that was intended to gain credibility with the fact finder

and avoid convictions on those counts that carried mandatory indeterminate sentences."
*Id.* The conclusion that this was the agreed-upon defense strategy made after thorough investigation of law and facts finds factual support in the state-court record. ECF No. 28, Hr'g Tr. Oct. 16, 2019 at 39–41, 162–66; *see also Strickland*, 466 U.S. at 690 (stating that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Again, the findings of fact must be presumed correct in the absence of clear and convincing evidence to the contrary under § 2254(e)(1). Mr. Walker does not present clear and convincing evidence to rebut the presumption of correctness. Consequently, the requirements for habeas relief have not been met and this claim will be denied.

### C. Claim 3: Failure to Charge Sentence Enhancer

Mr. Walker's third and final claim is that the indeterminate life sentences imposed on 24 of the exploitation counts were improper because the discretionary sentence enhancer was not charged in the complaint and information. *Id.* at 12–16. First a recap of the CSC's decision, then a discussion of § 2254.

#### 1. CSC's Decision

The CSC addressed this claim on certiorari review as part of Mr. Walker's direct appeal:

IV. Indeterminate Sentences

The trial court imposed indeterminate sentences on Walker for twenty-four of his sexual exploitation counts. We granted certiorari to consider whether determinate sentences must be imposed on these counts because section 18–1.3–1004(4)(a)(II) was not charged or because there was no jury trial

waiver. We now affirm Walker's indeterminate sentences.[4]

[Footnote 4 Because Walker was required to litigate the validity of his jury trial waiver in a post-conviction proceeding, we need not consider any effect of his allegedly invalid waiver on his sentences.]

Walker advances two arguments against the trial court's imposition of indeterminate sentences for his conviction on twenty-four counts of sexual exploitation of a child. He first argues that his indeterminate sentences violate the United States Supreme Court's decision in *Apprendi v. New Jersey,* 530 U.S. 466, 490 (2000). In that case, the Supreme Court held that "[i]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Id. Apprendi* and its progeny apply to jury fact-finding. *See, e.g., United States v. Booker,* 543 U.S. 220, 244 (2005) ("Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.").

Because we hold that Walker is prohibited from challenging the validity of his waiver of the right to a jury trial on direct appeal, however, we must assume for the purposes of this argument that his waiver was indeed valid. As such, the trial court's fact-finding carries the same significance as though the facts were found by a jury. *See Blakely v. Washington*, 542 U.S. 296, 310 (2004) (holding, in the context of a defendant's guilty plea, that "the State is free to seek judicial sentence enhancements so long as the defendant . . . consents to judicial factfinding"). Therefore, *Apprendi* has no bearing on his claim.

Walker also argues that his information did not provide sufficient notice that he might face indeterminate sentencing on the twenty-four counts of sexual exploitation of a child. Whether the information sufficiently charged Walker is a question of law we review de novo. *People v. Melillo*, 25 P.3d 769, 777 (Colo. 2001). Our de novo review reveals that the information was sufficient, as it identified the essential elements of the crime charged. *See id.* at 777–78; *see also* Crim. P. 7(b)(2) (providing the requirements for determining that an information is "technically sufficient"). The information therefore put Walker on notice that he was charged with multiple counts of sexual exploitation of a child and thus provided sufficient notice that these charges were subject to discretionary indeterminate sentencing pursuant to section 18-1.3-1004(4).

Accordingly, we affirm Walker's indeterminate sentences.

*Walker*, 318 P.3d at 486.

### 2. Application of § 2254

Respondents contend that this claim fails for two reasons. One, there is no clearly established Supreme Court precedent holding that the failure of a state charging document to reference a discretionary sentencing enhancement statute violates federal law. ECF No. 29 at 54–59. Two, the CSC's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law. *Id.*

The Court begins by noting that the CSC's resolution of this claim was supported by citation to two sources of *state* law: *People v. Melillo*, 25 P.3d 769, 777 (Colo. 2001) and Colo. Crim. P. 7(b)(2). Insomuch as the CSC's decision turned on matters of state law, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *see also Anderson-Bey v. Zavaras*, 641 F.3d 445, 453 (10th Cir. 2011) (rejecting "Defendant's challenge to the affirmance of his conviction [because it was] in essence a challenge to the Colorado Court of Appeals' interpretation of the state robbery statute, a challenge that we cannot entertain in a proceeding under § 2254").

Furthermore, the claim fails because it is premised on a legal right that was not clearly established at the time Mr. Walker's state court conviction became final. *Williams*

24

*v. Taylor*, 529 U.S. 362, 380 (2000) (stating that AEDPA "requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state court conviction became final"). Mr. Walker acknowledges as much in his habeas application. *See* ECF No. 8 at 14 ("The U.S. Supreme Court's precedent establishes, without actually holding, that a state charging document must provide notice of any fact (other than a prior conviction) that increases the maximum penalty for a crime in order to comply with the Sixth and Fourteenth Amendments.").

Moreover, the precedent Mr. Walker relies on does not stretch far enough to cover his claim. He relies on *Apprendi*, which held as follows: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. But *Apprendi* explicitly stopped short of deciding the claim presented here by Mr. Walker. The *Apprenidi* Court declined to hold that the right to a trial by jury, and the right to have every element of a crime proven beyond a reasonable doubt to a jury, extends to having "sentence enhancements" included in the indictment. *Id.* at 477 n.3. (stating that the Fourteenth Amendment "has not . . . been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury'"); *see also Williams v. Haviland*, 467 F.3d 527, 533 (6th Cir. 2006) (recognizing that "*Apprendi* does not address the issue of the requirements for indictments in state prosecutions"). Because Mr. Walker does not show that this claim runs afoul of any clearly established decision of the United States Supreme Court, it necessarily fails under 28 U.S.C. § 2254(d)(1). As

such, Claim 3 will be denied.

## IV. CONCLUSION

Ultimately, Mr. Walker does not show that he is in custody in violation of the Constitution or laws or treaties of the United States. Therefore, there is no basis for habeas relief under 28 U.S.C. § 2254.

Accordingly, it is ORDERED that:

1. The amended Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, ECF No. 8, is DENIED and this case is DISMISSED;

2. No certificate of appealability will issue because Mr. Walker has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c); and

3. Leave to proceed *in forma pauperis* on appeal is DENIED WITHOUT PREJUDICE to the filing of a motion seeking leave to proceed *in forma pauperis* on appeal in the United States Court of Appeals for the Tenth Circuit. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this dismissal would not be taken in good faith.

DATED this 21st day of October 2024.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge